Alan J. Thayer, Jr., OSB No 853,428
Innovative Law Group
P.O. Box 1268
Eugene, Oregon 97440
(541) 345-2325
alan@thinkILG.com

Jonathan T. Suder (*pro hac vice*)
Brett M. Pinkus (*pro hac vice*)
Glenn S. Orman (*pro hac vice*)
Richard A. Wojcio, Jr. (*pro hac vice*)
FRIEDMAN, SUDER & COOKE
604 E. Fourth Street, Suite 200
Fort Worth, TX  76102
(817) 334-0400
(817) 334-0401 fax
jts@fsclaw.com
pinkus@fsclaw.com
orman@fsclaw.com
wojcio@fsclaw.com

ATTORNEYS FOR PLAINTIFF
ADASA INC.

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

### Eugene Division

| | |
|---|---|
| **ADASA INC.,** | Case No.: 6:17-CV-01685-MK |
| Plaintiff, | |
| v. | **SECOND AMENDED COMPLAINT** |
| **AVERY DENNISON CORPORATION,** | |
| Defendant. | **JURY TRIAL DEMANDED** |

Plaintiff ADASA INC. ("Plaintiff" or "ADASA") files this Second Amended Complaint

against Defendant AVERY DENNISON CORPORATION, alleging as follows:

1

## I.  THE PARTIES

1.      ADASA INC. is a corporation organized and existing under the laws of the State of Oregon, with a principal place of business in Eugene, Oregon.

2.      Upon information and belief, Defendant AVERY DENNISON CORPORATION ("Defendant" or "AVERY DENNISON") is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business in Glendale, CA.   AVERY DENNISON's Retail Branding and Information maintains an office in Beaverton, Oregon. AVERY DENNISON may be served with process through its registered agent, CT Corporation System located at 78 Commercial Street SE, Suite 100, Salem, OR  97301. Defendant has made an appearance through counsel and is presently before this Court.

## II.  JURISDICTION AND VENUE

3.      Plaintiff's claims for patent infringement against AVERY DENNISON arise under the patent laws of the United States, including 35 U.S.C. §§ 271 and 281. Consequently, this Court has exclusive jurisdiction of such action under Title 28 U.S.C. § 1331 and 1338.

4.      AVERY DENNISON is a company with offices throughout the United States. AVERY DENNISON is subject to both the specific and general personal jurisdiction of this Court because, among other things, it has established continuous and systematic contacts with Oregon and in this judicial district, including having a regular and established place of  business in the District of Oregon and throughout the State of Oregon via AVERY DENNISON's Retail Branding and Information Solutions located in Beaverton, Oregon, which includes, at least in part, its retail RFID business; it has committed acts of patent infringement within Oregon and this judicial district giving rise to this action; and it has minimum contacts with the forum such that the exercise of jurisdiction over it would not offend traditional notions of fair play and substantial justice. For all

of these reasons, personal jurisdiction exists and venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1), (2) and (c)(2) and 28 U.S.C. § 1400(b).

5.      Additionally, AVERY DENNISON has availed itself of the jurisdiction of this Court by way of its answering ADASA's Original and First Amended Complaints in this litigation.

### III.  PATENT-IN-SUIT

6.      On October 24, 2017, U.S. Patent No. 9,798,967 ("the '967 Patent") was duly and legally issued for "SYSTEMS, METHODS, AND DEVICES FOR COMMISSIONING WIRELESS SENSORS."  The '967 Patent was subject to an *ex parte* reexamination, Reexamination Request No. 90/014,052, filed by Defendant on November 29, 2017.  The reexamination proceeding resulted in the issuance of a Reexamination Certificate on July 30, 2018 indicating that all claims of the '967 Patent are patentable as presented in the Reexamination Certificate.  A true and correct copy of the '967 patent with the appended Reexamination Certificate is attached hereto as Exhibit A.  The '967 Patent claims priority dating back to Non-Provisional Patent Application No. 12/124,768, filed on May 21, 2008.

7.      Plaintiff is the owner of the '967 Patent with the exclusive right to enforce the '967 Patent against infringers, and collect damages for all relevant times, including the right to prosecute this action.

8.      The '967 Patent generally speaking, relates, in part, to systems for encoded and commissioned wireless radio frequency identification ("RFID") devices. The '967 Patent teaches an RFID transponder or inlay with an RFID integrated circuit chip ("IC chip") having encoded memory structure that ensures uniqueness within the serial number portion of the code.

## IV.  BACKGROUND

9.      Clarke McAllister, the named inventor of the '967 Patent, has worked with and in the RFID industry since the early 1990s, including founding his own RFID company, ADASA, in 2004.

10.      At the time McAllister founded ADASA, the RFID industry was beginning to challenge the then-predominant method of using individual bar codes to keep track of merchandise. The industry has since developed standards and guidelines for encoding data onto the RFID tags to provide additional information beyond what can be stored in a barcode, which allows for identifying and tracking individual items in the supply chain.

11.      As a brief technical background, in the RFID industry, and particularly for merchandise tracking applications, the memory bank of an RFID tag is encoded with an Electronic Product Code ("EPC"), which is an identifier for an item in the supply chain to uniquely identify that particular item. This identifier is serialized to be unique for avoidance of duplicate numbers among items in the supply chain.  The EPC can be in a format in accordance with one of various EPC tag data standards set by GS1 for a serialized identifier, such as a Serialized Global Trade Item Number (SGTIN), Serial Shipping Container Code (SSCC), Serial Global Location Number (SGLN), or the like.

12.      For the SGTIN format used for item level identification, the EPC contains "object class" information and a "serial number."  The "object class" information includes, among other things, a GS1 "company prefix," which identifies the managing organization responsible for the item (*i.e.*, the brand owner) and an "item reference number" which identifies the class of item offered by a brand owner (which generally corresponds to the UPC or SKU of a bar code).

13.     The "object class" information of the SGTIN is not globally unique in and of itself. The function of this section of a SGTIN format is to uniquely identify different classes of products that may be sold by a particular brand owner. For example, a brand owner (such as Haggar, the clothing company) may assign a particular product line of its men's pants an "object class" number. With such a designation, each pair of that type of men's pants would have a common "object class" number, but each specific pair of men's pants within that type would not be globally unique without further identification. Therefore, in order to provide a unique identifier and avoid duplication of numbers, the brand owner is responsible for assigning a unique serial number for each item of an object class. The brand owner can delegate the assignment of the serial number to another party or parties.  The combination of an object class and unique serial number provides a unique object number that is contained within the EPC.

14.     In early 2008, McAllister recognized the challenge in the industry that there was not a reliable way to ensure global uniqueness of the EPC for items within one object class when the RFID tags are encoded by different encoders in different locations across the distribution chain. Prior to Mr. McAllister's invention, other methods of managing and assigning EPCs did not provide the level of specificity in managing the assignment of the EPCs taught in the '967 Patent or ensure that the EPC provided to an item would be globally unique without requiring real-time access to a central database to assign the next available unique EPC to each item in an object class.

15.     This is exemplified by the RFID industry's previous use of the "EPC Pure Identity URI" methodology.  The EPC Pure Identity is what is known as a canonical form, using a finite sequence of decimal digits, punctuated by periods.  In this format, no attention is given to managing the uniqueness of the EPC on the "binary" level (*i.e.*, at the zeroes and ones that make up the most basic bits of the code at the machine level), rather choosing a simpler and less effective

"decimal" or "hexadecimal" level representation of the EPC that is in a human readable format. For example, a "decimal" EPC Pure Identity URI may read as follows:

0017457.057157.338690212

In contrast, a "binary" level encoding of the same RFID tag in SGTIN-96 format would read as follows:

001100000011010000000001000100001100010000110111110100010100000000101 0000110000000000010100100

The EPC Pure Identity lacks the ability to provide information that uniquely distinguishes between objects of the same object class that, for example, are encoded at one manufacturing facility versus another, unless that information is specifically tracked in a database. To address this challenge, McAllister focused not on the Pure Identity representation of the EPC, but rather more specifically on the "serial number" portion of the binary level encoding of the EPC to better provide for managing the full serial number range at the machine code level. This allows an RFID encoder to encode a tag and be able to differentiate between items without human intervention and without necessarily requiring real-time access to a central database each time a tag is encoded or read.

16.    In particular, as an example of McAllister's invention, an RFID IC chip encoded with the SGTIN-96 format has a total of 96 binary bits in its memory bank, with the last 38 bits being the "serial number" section:

A typical EPC SGTIN-96 Structure:

| Header | Filter / Object Type | Partition | Company Prefix | Item Ref and Indicator | Serial |
|--------|---------------------|-----------|----------------|------------------------|--------|
| 8 bits | 3 bits | 3 bits | 20- 40 bits | 24 - 4 bits | 38 bits |

McAllister's invention configures an RFID IC chip's memory structure to further delineate a section using the leading bits of the serial number section of the EPC binary encoding, which are

referred to in the '967 Patent as the "most significant bits."  In other words, McAllister subdivided the serial number section of an RFID IC chip's memory into a "most significant bits" portion and a remaining portion of "lesser significant bits." McAllister's idea was that by using "most significant bits" at the beginning of a serial number section and assigning those most significant bits to a particular encoder for use with a particular object class, a brand owner could create a separate, encoder-managed serial number section within the larger serial number section of the binary encoding of the EPC.  This enables each encoder to reliably ensure the uniqueness of the serial numbers encoded to the tags, and therefore control the uniqueness of the EPC for each item within an object class at the machine code level.  These benefits can be obtained without requiring access to a central database as the single means for ensuring uniqueness, which provides for a reduction in time for the tags to be encoded that can be quite significant over the course of encoding a large quantity of tags.

17.     This section of "most significant bits" of the RFID IC chip's memory is designated to uniquely correspond to a block of serial numbers all having the same most significant bits.  The most significant bits are allocated by the brand owner or by agreement between the brand owner and a third-party encoder for use by an encoder in encoding tags for a specific object class.  Such a block of serial numbers can be allocated to an entity, such as a service bureau (like AVERY DENNISON's RFID Ticket Express Service Bureau), manufacturer, distributor, or retailer; to a location, such as an assembly line or manufacturing facility; or to a particular encoding machine for use with an object class.

18.     In the years after McAllister originally filed for patent protection for his invention, the industry began implementing McAllister's idea in wide-spread fashion and without attribution. For instance, third party encoders, such as AVERY DENNISON, encode RFID tags for brand

owners using the most significant bits of the serial number portion of the binary encoding of the EPC in the RFID chip's memory structure to create unique serial numbers for an associated object class.

## V.  FIRST CLAIM FOR RELIEF
### (Patent Infringement)

A.     Direct Infringement Under 35 U.S.C. § 271(a)

19.     Plaintiff incorporates by reference Paragraphs 1 - 18 of this Complaint as if set forth below.

20.     AVERY DENNISON is liable under 35 U.S.C. § 271(a) for direct infringement of the '967 Patent, either literally or under the doctrine of equivalents, because it makes, uses, sells, offers for sale, and/or imports encoded RFID tags and labels that use the unique encoded structure identified in the claims of the '967 Patent.

21.     AVERY DENNISON in the past has directly infringed and continues to directly infringe at least claims 1-6 and 12-15 of the '967 Patent by, at a minimum, AVERY DENNISON's RFID Ticket Express Service Bureaus which make, encode, sell, and offer to sell EPC Class 1, Generation 2 UHF RFID tags and labels to its customers, such as brand owners, manufacturers, distributors, retailers and other end users that use the above-referenced memory structure.  To the extent AVERY DENNISON encodes these tags and inlays for its customers using the format of "most significant bits" within the serial number space for its customers, it infringes the above claims of the '967 Patent.

22.     More specifically, AVERY DENNISON makes, encodes, sells, and offers to sell RFID tags and labels for customers that are RFID transponders that comprise a substrate, an antenna, and an RFID IC chip coupled to the antenna. The RFID IC chips are provided to AVERY DENNISON in the accused products by Impinj, NXP, EM Microelectronics, and other chip

manufacturers.  AVERY DENNISON manufactures inlays using these IC chips and then converts the inlays into tags and labels.  Upon information and belief, AVERY DENNISON does not publicly identify the product name or number for its tags and labels.  However, for example, AVERY DENNISON offers at least tags and labels to its customers with at least the following inlays: AD-160u7, AD-171m5, AD-172u7, AD-180u7, AD-226iM, AD-227m5, AD-229r6, AD-229r6-P, AD-233m5, AD-236u7, AD-237r6, AD-237r6-P, AD-318m5, AD-319eMm AD-320u7, AD-321r6, AD-370u7, AD-380iM, AD-381m5, AD-383u7, AD-550m5, AD-661r6, AD-661r6-P, AD-680r6, AD-680r6-P, and AD-806u7.  AVERY DENNISON then encodes the IC chips of the tags and labels pursuant to GS1 standards and guidelines and in accordance with the specifications and schemas selected by the managing organization responsible for the item, *i.e.,* brand-owners based on an AVERY DENNISON proposal or selected directly by AVERY DENNISON.

23.    AVERY DENNISON encodes the RFID tags and labels with an EPC.  The EPC is encoded as a binary encoding within the memory structure of the RFID IC chip of the tag having an object class information space and a unique serial number space.  The object class information space is encoded with the object class information for an item and the unique serial number space is encoded with a unique serial number for that specific item within that object class.  A limited number of most significant bits of the serial number space within the EPC binary encoding is fixed to uniquely correspond to a limited number of most significant bits assigned to the block of serial numbers that was allocated to the encoder by the brand owner and/or by agreement between the brand owner and AVERY DENNISON or by delegation to AVERY DENNISON.  The remaining bits of lesser significance are encoded to form one unique serial number selected from the range of serial numbers within the block allocated to the encoder, which can be issued by the encoder in linear sequence, randomly, or otherwise in accordance with the specifications from by the

managing organization responsible for the item or as determined by delegation to AVERY DENNISON.

24.    In particular, AVERY DENNISON encodes an EPC SGTIN-96 binary encoding in the memory bank of the RFID tags and labels, with the unique EPC being encoded in binary form. The 38-bit serial number portion of the encoded EPC comprises the particular set of most significant bits corresponding to the most significant bits allocated to the encoder for the object class of the items with which the RFID tags and labels are to be used. For example, schemas and scanned RFID tags associated with various Global Company Prefixes of known AVERY DENNISON customers reflect that up to 18 most significant bits of the 38-bit serial number section are fixed to correspond to the most significant bits of an allocated block of serial numbers. The remaining 20 or more bits of lesser significance are encoded with one unique serial number instance from the allocated block of serial numbers. One example is provided below for tags scanned for Global Company Prefix 0088542 for PVH Corp:

38 bit Serial Number Section: 00000000011110000100000000***********

                          18 Most Significant Bits       Varied Least Significant Bits

25.    In other cases, the schemas and the scanned RFID tags reflect that 2 to 6 most significant bits are fixed to uniquely correspond to the most significant bits of an allocated block of serial numbers for use with an object class, and which the remaining least significant bits are encoded to form one unique serial number instance from the allocated block of serial numbers within the serial number space.

26.    To the extent AVERY DENNISON encodes any of the tags and labels identified in paragraph 22 of this complaint or additional RFID tags and labels not identified therein that use

the format specified herein, AVERY DENNISON has infringed the identified claims of the '967 Patent.

27.     Additionally, AVERY DENNISON in the past has directly infringed and continues to directly infringe at least claims 1-6 and 12-15 of the '967 Patent by, at a minimum, AVERY DENNISON's selling and offering to sell its RFID tags and labels where encoding of the RFID transponder is performed at an AVERY DENNISON Service Bureau and/or at an AVERY DENNISON customer location using AVERY DENNISON's In-Plant Printing Systems ("IPPS") products and services.  To the extent AVERY DENNISON offers for sale and/or sells these RFID tags and labels, such as those identified in Paragraph 22, in the United States having been encoded with object space data and a serial number which includes a sequence of "most significant bits," AVERY DENNISON infringes at least the identified claims of the '967 Patent.

28.     AVERY DENNISON offers for sale and sells both Service Bureau and In-Plant Printing System ("IPPS") products.  Service Bureau products are encoded by AVERY DENNISON personnel directly at AVERY DENNISON Service Bureau locations.  RFID tags and labels sold as IPPS products are encoded using AVERY DENNISON hardware and software at customer locations.  For IPPS customers, AVERY DENNISON supplies all necessary hardware, software, the RFID transponders, and encoded data for encoding of the RFID transponder to occur at a customer facility.  Encoding is effected in accordance with schema and formats developed by AVERY DENNISON and proposed by AVERY DENNISON.

29.     For all AVERY DENNISON customers, whether IPPS customers or Service Bureau customers, AVERY DENNISON and its customers enter purchase or supply agreements under which subsequent part orders are made.  Upon information and belief, following formation of an agreement under which formats, schemas, and prices for the RFID tags and labels are set,

AVERY DENNISON customers purchase encoded RFID tags and labels via submission of part orders through software and an online interface accessible by AVERY DENNISON's personnel or customers.  Part order data is directed via AVERY DENNISON's software to AVERY DENNISON's D2Comm and serialization manager systems in Culpepper, Virginia for generating and transmitting all of the encoding data for commissioning the RFID tags and labels that were ordered.  This encoding data is then transmitted to AVERY DENNISON's printer/encoders at the encoding location to commission the ordered RFID tags and labels and fill the part order.  All encoded RFID tags and labels made or sold by AVERY DENNISON comprise data sent from Culpepper, Virginia which is generated in response to receipt of part orders.

30.    Upon information and belief, part order data including at least the quantity of RFID tags and labels ordered is directed to AVERY DENNISON locations in the U.S. for billing and invoicing each part order upon receipt thereof, with such billing in U.S. dollars.

31.    Upon information and belief, AVERY DENNISON's agreements with its customers are negotiated in the U.S. by AVERY DENNISON personnel.  These agreements detail the procedures to be employed for ensuring that all RFID tags and labels sold are encoded with unique object numbers comprising object class information and a serial number utilizing most significant bits, among other general terms.  The negotiation of agreements includes submission of an initial proposal by AVERY DENNISON to a potential customer that proposes schemas and formats to be used to generate unique object numbers to be encoded into RFID tags and labels sold thereunder.

32.    Upon information and belief, AVERY DENNISON proposes a default encoding scheme to its potential customers, whether IPPS or Service Bureau customers, that contemplates AVERY DENNISON retaining control over serialization management (i.e., the allocation and

12

assignment of unique object numbers for encoding).   In its customer proposals, AVERY DENNISON emphasizes the importance of uniqueness within item level RFID tagging systems. Further, AVERY DENNISON touts its D2Comm system and global serialization network, operating from Culpepper, Virginia, as providing unique object numbers, regardless of whether encoding is effected by AVERY DENNISON at one of its Service Bureaus or by an AVERY DENNISON customer using IPPS.   This understanding of AVERY DENNISON's systems and operations for ensuring uniqueness of encoded RFID tags and labels is based upon confidential information presented in at least documents at Bates numbers AD005267, AD005309, and AD005328.

33.   Upon information and belief, AVERY DENNISON's "default" encoding schema proposal implements "most significant bits" within the serial number space of the unique object number encoded into each RFID tag or label produced.   This "default" scheme is sometimes referred to as AVERY DENNISON's "National Brand EPC Schema."   This understanding of AVERY DENNISON's default encoding schema is based upon confidential information presented in at least the document at Bates number AD003277.

34.   According to this National Brand EPC encoding scheme, the 38-bit serial number space is partitioned into sections which include, at least, a predefined first section comprising 18 most significant bits to which a second, incrementing portion is appended.   AVERY DENNISON offers for sale and sells RFID transponders encoded in accordance with its "National Brand EPC Schema," as well as other schemas which likewise comprise a predefined sequence of most significant bits within the serial number space of the encoded data string defining a unique object number.

35.     In accordance with this process for setting up and processing part orders following execution of a purchase or supply agreement with it customers, AVERY DENNISON offers to sell and sells its RFID tags and labels from the United States, regardless of where encoding occurs. This scheme of receiving and fulfilling individual part orders for its customers therefore represents an independent basis for ADASA infringement allegations against AVERY DENNISON under 35 U.S.C. § 271(a).

B.     Indirect Infringement Under 35 U.S.C. §§ 271(b), (c), and (f).

36.     Additionally, AVERY DENNISON is liable under 35 U.S.C. §§ 271(b) and (c) for indirect infringement of the '967 Patent, either literally or under the doctrine of equivalents, because it actively induces and/or contributes to the direct infringement of the '967 Patent by its customers who make, use, and/or import encoded RFID tags and labels that use the unique encoded structure identified in the claims of the '967 Patent.

37.     For its Service Bureau customers, AVERY DENNISON provides RFID tags and labels encoded with unique object numbers comprising object class information and a serial number utilizing most significant bits to its customers who then import to and/or use the infringing RFID transponders in the United States for item-level tracking and inventory management. AVERY DENNISON's infringing RFID transponder products are especially designed for use via affixing them to goods for scanning to track those goods as they travel through the stream of commerce.  This item-level identification and tracking is advertised as providing quick and accurate inventory information for AVERY DENNISON's customers.  According to AVERY DENNISON, "[o]ur RFID inlays and technology help to increase inventory speed, accuracy and visibility—as well as profit margins—for retail apparel brands."  AVERY DENNISON also touts that "[c]ompanies with high-volume global operations and complex supply chains leverage Avery

Dennison's RFID solutions to improve their operational efficiency, reduce stock-outs and increase sales."

38.     AVERY DENNISON's customers are instructed to and do affix the infringing RFID transponders to their goods for tracking and inventory purposes, whereby each instance of scanning (i.e., reading) the encoded information stored on an infringing RFID transponder constitutes a use thereof.  AVERY DENNISON markets and sells RFID readers to its customers that are used for item tracking and inventorying using the information read from AVERY DENNISON's infringing RFID tags.

39.     Such importing and/or use of the infringing RFID tags and labels by AVERY DENNISON's customers directly infringes at least claims 1-6 and 12-15 of the '967 Patent. AVERY DENNISON makes and sells its infringing RFID tags and labels knowing that they are especially designed for and marketed for such use by its customers to effect item-level tracking and rapid inventorying through use of ADASA's patented technology.  For example, information provided in AVERY DENNISON's customer proposals tout both the benefits of RFID use for these purposes and identify the serialization schema employed by AVERY DENNISON as ensuring the uniqueness required for an effective RFID tracking and inventorying system as identified by confidential information identified at documents produced in this case and Bates numbered AD005267, AD005309, and AD005328.

40.     Additionally, AVERY DENNISON offers and provides "tag up" services for its customers to aid in the rollout of RFID use.  "Tag up" services include affixing infringing RFID tags and labels to goods within customer stores, distribution centers, and/or warehouses for immediate use by the customer to begin tracking and inventorying those goods.   AVERY

DENNISON trains customer personnel on the use of the infringing RFID tags and scanner devices for item-level tracking and inventorying.

41.     AVERY DENNISON makes and sells its infringing RFID tags and labels knowing at least some will be imported to and used in the United States by AVERY DENNISON's customers.  For at least some of its customers, such as those having significant or, perhaps, exclusive operations in the United States, AVERY DENNISON makes and sells its infringing RFID tags and labels thereto knowing that most or all will be imported to and used in the Untied States.

42.     Additionally, AVERY DENNISON is liable under 35 U.S.C. § 271(f) for infringement of the '967 Patent, either literally or under the doctrine of equivalents, because it provides from the United States data files that include unique object numbers implementing the unique structure identified in the claims of the '967 Patent which are transmitted to foreign encoding locations operated by AVERY DENNISON or by its customers at the direction of AVERY DENNISON.  The unique object numbers are provided with the intent that they be combined with uncommissioned RFID tags and labels to make infringing RFID tags and labels.

43.     The unique object numbers are especially made or especially adapted for use in accordance with the inventions claimed in the '967 Patent.  Upon information and belief, each data file comprising the unique object numbers is intended for use and used by only to commission RFID tags and labels.

44.     The unique object numbers transmitted are not staple articles or commodities of commerce suitable for substantial noninfringing use.  They are known to AVERY DENNISON to be especially made or especially adapted for use in accordance with the inventions claimed in the

'967 Patent since at least October 6, 2017 or, alternatively, since the filing of the original complaint in this litigation.

45.    AVERY DENNISON has had actual notice of its infringement of the claims that were issued in the '967 Patent since receipt of a letter sent on October 6, 2017 to AVERY DENNISON's counsel of record from the previously litigation between the same parties.  A letter in response from AVERY DENNISON'S counsel was received by Plaintiff's counsel on October 19, 2017.  In addition, AVERY DENNISON has had actual knowledge of ADASA's claims of patent infringement against AVERY DENNISON consistent with those presented herein since at least the filing of the original complaint in this litigation, if not earlier.

46.    Plaintiff has been damaged as a result of AVERY DENNISON's infringing conduct.  AVERY DENNISON is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff for AVERY DENNISON's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## VI.  PRAYER FOR RELIEF

Plaintiff requests that the Court find in its favor and against AVERY DENNISON, and that the Court grant Plaintiff the following relief:

a.    Judgment that one or more claims of the '967 Patent have been infringed, either literally and/or under the doctrine of equivalents, by AVERY DENNISON;

b.    Judgment that AVERY DENNISON account for and pay to Plaintiff all damages to and costs incurred by Plaintiff because of AVERY DENNISON's infringing activities and other conduct complained of herein;

c.    That AVERY DENNISON, its officers, agents, servants and employees, and those persons in active concert and participation with any of them, be permanently

enjoined from infringement of the '967 Patent.  In the alternative, if the Court finds that an injunction is not warranted, Plaintiff requests an award of post judgment royalty to compensate for future infringement;

d.      That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused to it by reason of AVERY DENNISON's infringing activities and other conduct complained of herein;

e.      That this Court declare this an exceptional case and award Plaintiff its reasonable attorney's fees and costs in accordance with 35 U.S.C. § 285; and

f.      That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.


DATED:  October 2, 2019.                    By: */s/ Brett M. Pinkus*

                                            Alan J. Thayer, Jr., OSB No 853,428
                                            Innovative Law Group
                                            P.O. Box 1268
                                            Eugene, Oregon 97440
                                            (541) 345-2325
                                            alan@thinkILG.com

                                            Brett M. Pinkus (*pro hac vice*)
                                            Jonathan T. Suder (*pro hac vice*)
                                            Glenn S. Orman (*pro hac vice*)
                                            Richard A. Wojcio, Jr. (*pro hac vice*)
                                            FRIEDMAN, SUDER & COOKE
                                            604 E. Fourth Street, Suite 200
                                            Fort Worth, TX  76102
                                            (817) 334-0400
                                            (817) 334-0401 fax
                                            jts@fsclaw.com

pinkus@fsclaw.com
orman@fsclaw.com
wojcio@fsclaw.com

ATTORNEYS FOR PLAINTIFF
ADASA INC.